**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 1:23-CR-242 (APM)** |
| | : | |
| **STEPHEN ALEXANDER ONDULICH,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. Stephen Alexander Ondulich has pleaded guilty to two second degree misdemeanors, a violation of 40 U.S.C. § 5104(e)(2)(D) (disorderly or disruptive conduct on the grounds or in the buildings of the United States Capitol) (Count Three) and a violation of 40 U.S.C. § 5104(e)(2)(G), (parading, demonstrating, or picketing in any Capitol building) (Count Four). For the reasons set forth herein, the government requests that this Court sentence Ondulich to 21 days' imprisonment on Count Three and 36 months' probation on Count Four. The government also requests that this Court impose 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution.

I.    **Introduction**

Defendant Stephen Alexander Ondulich, an equipment operator at a fracking site, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the

1

peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than $2.9 million in losses.[1]

Ondulich pleaded guilty to violations of 18 U.S.C. §§ 5104(e)(2)(D) and (G). The government's recommendation is supported by the defendant's decision to brag about his behavior on social media and his history of stalking and violations of court-imposed limitations.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Ondulich's crime support a sentence of 21 days' imprisonment, 36 months' probation, 60 hours of community service, and $500 in restitution in this case.

## II.    Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* Statement of Offense, ECF No. 28.

*Defendant Ondulich's Role in the January 6, 2021 Attack on the Capitol*

On January 6, 2021, Ondulich attended the Stop the Steal rally around the White House Ellipse, then made his way to the Capitol, trespassing over the grounds' restricted perimeter along

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

the way.  In a video from the West Front of the Capitol, Ondulich could be seen in the crowd as rioters scaled the scaffolding outside—a clear sign that he and others should not be there.  At 3:32 p.m., he joined hundreds of other rioters and entered the Capitol through the Senate Wing Door. He did so as alarms loudly blared.  Inside, he held a cell phone up as if filming or photographing the scene, and left three minutes later, at 3:35 p.m.

 

*Image 1*
*Ondulich on the Northwest Terrace*

*Image 2*
*Ondulich inside the Senate Wing Corridor*

Ondulich also spent time outside the Senate Wing Corridor, and several videos showed him walking or standing just feet away from lines of officers.  In these videos, police stood guard, but Ondulich did not leave the area.



*Image 3: Ondulich near officers outside the Senate Wing Corridor*



*Image 4: Ondulich near officers on the Upper West Terrace*

The government also obtained a search warrant for the contents of Ondulich's Instagram account. In it, Ondulich had several photos that he appeared to have taken from his time in the Capitol. For instance, in response to someone asking him on January 6, 2021, "We're [sic] you here?" Ondulich sent the following photo of the Senate Wing Corridor, suggesting that he was:



*Image 5: Photo shared by Ondulich on January 6, 2021*

On January 7, 2021, Ondulich sent a message to another user "I was there.  It was Glorious!" and

"I was IN there!" and sent several pictures, including the following, as well as a video of his travel

through the Senate Wing Corridor.

  

*Image 6: Photo shared by Ondulich as he leaves the Senate Wing Corridor*

*Image 7: Photo shared by Ondulich as he is inside the Capitol*

*Image 8: Still image of video of Ondulich's travel through Senate Wing Corridor*

These images correspond to Ondulich's location as observed on Capitol surveillance footage.

In another conversation on Instagram on January 7, 2021, Ondulich wrote:

> Lmao we took the capital BACK from the communist scum that is the Democrats. We are not even remotely close to what BLM and Antifa do. I've seen both. In person. I've gone to war with BLM. I know who they are. They're anarchists. We are not. And our cause is not destruction like BLM/Antifa. Ours is freedom. And we took that capital. And we accomplished (a part of) our goal. 😄 And it was Glorious. There was no violence. And no aggression at all. And yes. We did go into the democrats offices. It is after all the PEOPLES HOUSE. and they are enemies of the people. And deserve to die a traitors death. Their blatant and emboldened treason is beyond.

Later he wrote the following, which suggested he was involved in pushing through a police line:

> That's right. Because we're not anarchists. 😄 Or terrorists. We're patriots. We aren't the same threat to the police as Antifa and BLM are. 😄 I was AT the front line. I was in front of the police . . . We didn't attack them. We pushed our way through them. Once we got through. We left them alone. Our job wasn't to attack the police. It was to take control of OUR Capitol. 😄

The person he was writing to replied: "bruh that's literally domestic terrorism . . . do you do not see that." Ondulich wrote back: "No. It's not. Hate to break it to you. 😄" Also on January 7, 2021, Ondulich wrote:

> Btw. We. Unlike BLM and Antifa. Don't burn down city blocks and buildings. We don't destroy everything in our path. And tear down statues. We are not apart of cancel culture. Our accomplishments today were not even remotely close to that. We stormed the Capitol with minimal damage. And yes we DID Ransack and rearrange the offices of our enemies. And I promise this is just the beginning.

In yet another statement on Instagram, Ondulich alluded to his participation in the breach of the Capitol, writing:

> We had a lot of black people with us . . . . That argument doesn't really work. We're just not deranged thugs like the black people that this statement is about. We are patriots. And we took our house. The people's house . . . . Soooooooooo yea. We also don't have the sole purpose of attacking the police. I was there (and I'm not white) I was in front of them.

Collectively, Ondulich's Instagram posts show his pride in his actions on January 6, his ambition to "take control" of the Capitol, his suggestion that he physically pushed through a police line, and his awareness that "we" had entered private offices: sensitive spaces.

*Defendant's Arrest and Interview*

Ondulich was arrested on July 19, 2023, and spoke with FBI agents over the course of the day.  He initially said that he did not remember going inside the Capitol on January 6, 2021.  When told that a mobile device associated with his Gmail account was present at the Capitol that day, Ondulich replied that cellphones were a "one-eyed snitch."  When shown photos from his Instagram account, Ondulich conceded only that he may have gone to the Capitol's front and side. While Ondulich admitted to trespassing onto the Capitol grounds, he refused, even in the face of evidence, to admit that he entered the building.

*The Charges and Plea Agreement*

On July 24, 2023, the United States charged Ondulich by a four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G).  On December 1, 2023, pursuant to a plea agreement, Ondulich pleaded guilty to Counts Three and Four of the Information, charging him with a violation of 40 U.S.C. §§ 5104(e)(2)(D) and (G).  By plea agreement, Defendant agreed to pay $500 in restitution to the Architect of the Capitol.

## III.    Statutory Penalties

Ondulich now faces sentencing for violating 40 U.S.C. §§ 5104(e)(2)(D) and (G).  As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment, five years of probation, and a fine of up to $5,000 on each count.  The defendant must also pay restitution under the terms of his plea agreement.  *See* 18 U.S.C. § 3663(a)(3); *United*

*States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As these offenses are Class B Misdemeanors, the Sentencing Guidelines do not apply. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 21 days' imprisonment, 36 months' probation, 60 hours of community service, and $500 in restitution.

#### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Ondulich's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Ondulich, the absence of violent or destructive acts is not a mitigating factor. Had Ondulich engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Ondulich's case is his decision to brag about his exploits at the Capitol, as described above. Ondulich shared—gleefully—his pictures from the day, wrote that his job was to "take control of OUR Capitol," and "promise[d] this is just the beginning." He saw his act as more than a simple trespass, but a step toward revolution. Included in his braggadocio was a defense of his fellow rioters' entry into members of Congress's offices. When confronted that what he did was "literally domestic terrorism," Ondulich simply said it

wasn't, and replied with a crying-laughing emoji. Given Ondulich's statements, his relatively short time in the Capitol belies his dangerous, destructive intentions. His comments also suggest he engaged in physically obstructive acts (pushing through police lines), although the government has not found video evidence corroborating this claim.

### B.  Ondulich's History and Characteristics

Ondulich has a concerning criminal history that warrants serious attention. Between 2012 and 2014, Ondulich displayed a pattern of stalking and harassment toward a woman with whom he had been in relationships. Pretrial Sentence Report ("PSR"), ECF No. 29 at ¶ 23. In 2012, Ondulich shot an air gun at the former partner, after which she obtained a protective order. *Id.* A month after that order expired, Ondulich began sending threatening text messages to her, including one that said:

> Every move your miserable fucking self makes is documented and recorded. I know everything you do. I have more eyes and ears that you can imagine. Uncomfortable? Good. It's just the beginning. I know everything you do of every day of the week. And everything you do and say on every social and personal account you have. We see every move you make from morning to evening. We know everything you do.

*Id.* The next month, in January 2014, Ondulich was seen in his ex-partner's backyard, wearing a trench coat and holding a rifle. *Id.* In March 2014, Ondulich twice fired an air gun at the victim. *Id.* Yet, when confronted with police, Ondulich appeared to lie about whether he was in the area. *Id.* Later, Ondulich admitted to shooting the air rifle at the victim and to threatening her via text message. *Id.* For his actions, Ondulich was convicted of assault and harassment, and given a suspended sentence of three years in custody. *Id.*

This was not the last time Ondulich broke the law. In 2015, Ondulich was pulled over by the police for failing to wear a seatbelt. PSR at ¶ 24. During that encounter, police found in the car three revolvers, one of which had an illegal conversion kit. *Id.* Ondulich also had in the car

shotgun shells, bulletproof vest and tactical helmet, hundreds of firecrackers and red-and-blue lights that could be used to imitate a police car.  *Id.*  Police then searched Ondulich's home, where they discovered yet more guns, including an assault-style shotgun and two more revolvers. *Id.*  When police searched Ondulich's Facebook account, they saw he'd posted comments hostile to gay, Jewish, and Black people.  *Id.*  Needless to say, because Ondulich was on probation at the time, he was prohibited from possessing all these firearms.  He was sentenced to two years' probation and one year of imprisonment, of which he served 110 days.  *Id.*

Yet, even then, Ondulich did not obey the law.  In 2017, he was convicted of violating the terms of his probation, for violating another ex-partner's protective order.  PSR at ¶ 24. Specifically, Ondulich had trailed the ex-partner in a car while she was walking on foot; he gave her "dirty looks" and potentially filmed her.  His ex-partner contacted the police, and Ondulich was ultimately given a suspended sentence of 90 days in prison.  *Id.*

Collectively, what these violations show is that Ondulich deliberately, and consistently, disregards the law.  That he has repeatedly violated the terms of his probation suggests that he, quite simply, does not take commands of the court seriously, and does not merit the kind of lenient treatment that a first-time offender might.  It is therefore important that his sentence in this case be sufficiently serious that, this time, he understands its gravity.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on

our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol.  Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration.  "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.  Quite simply, the gravity of these offenses demands deterrence.  *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW) (DDC Feb. 23, 2022) Tr. at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again.").  This was not a protest.  And it is important to convey to future potential rioters—especially those who

intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a term of home confinement. Through a decade in the criminal justice system, Ondulich has shown a pattern of dishonesty and disregard for the law. He lied about stalking a former partner with a gun. PSR at ¶ 23. He possessed multiple guns, despite a prohibition on such ownership. *Id.* at ¶ 24. He contacted a former partner, in violation of a protective order. *Id.* And he told FBI agents, improbably, that he did not remember entering the Capitol on January 6, 2021.

While Ondulich has taken some measure of responsibility by pleading to two offenses in this case, there is no evidence that his basic attitude towards the law and law enforcement has changed. Absent a meaningful sentence that includes home detention, Ondulich is likely to view his actions on January 6, 2021 as yet more crimes he managed to avoid consequences for.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[2] This Court must sentence Ondulich based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

---

[2] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "See sentences handed down in Capitol Breach cases." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Ondulich has pleaded guilty to Counts Three and Four of the Information, charging him with Disorderly Conduct in a Capitol Building or Grounds, in violation of 40 U.S.C. § 5104(e)(2)(D), and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).  These offenses are Class B misdemeanors.  18 U.S.C. § 3559.  Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9.  The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Vollan*, 1:22-CR-44 (APM), the defendant entered the Capitol by climbing through a broken window shortly after the initial breach and walked throughout the building for more than 15 minutes.  He also took photos with his cell phone inside the building, though deleted them before they could be used as evidence against him or other rioters.  The defendant was sentenced to 12 months' probation, 60 hours of community service, and $500 in restitution.  Ondulich's behavior was in some ways less severe than Vollan's, in that Ondulich entered through a door (rather than a broken window) and spent less time in the building.  But Vollan had no criminal history.  Ondulich's record of disregarding the law warrants a higher sentence.

In *United States v. Korte et al.*, 1:22-CR-183 (TSC), the defendant Brian Morgan was sentenced to 21 days' incarceration. Like Ondulich, Morgan apparently took numerous videos or photos of the riot in and outside the Capitol. Like Ondulich, Morgan had plenty of notice that he was not supposed to be where he went: Morgan was near the front of a mob that removed police barriers and assaulted officers, though did not make contact with the police himself. And like Ondulich, Morgan did not express remorse for his actions. But unlike Ondulich, Morgan had no prior convictions. Ondulich's sentence should therefore be somewhat more severe than Morgan's.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.     Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to

14

restitution under the VWPA).[3]  Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and be applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b).  At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here.  The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Ondulich must pay $500 in restitution, which reflects in part the role Ondulich played in the riot on January 6.[4]  Plea Agreement at ¶ 11, ECF No. 27.  As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.*  (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Ondulich's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities.  *See* PSR at ¶ 67.

---

[3] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C.  § 3663A(c)(1).

[4] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 21 days' imprisonment, 36 months' probation, 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution.  Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Ondulich's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crimes.

> Respectfully submitted,
>
> MATTHEW M. GRAVES
> United States Attorney
> D.C. Bar No. 481052
>
> By:     s/ *Brendan Ballou*
> Brendan Ballou
> DC Bar No. 241592
> Special Counsel
> U.S. Attorney's Office
> 601 D Street, NW
> Washington, DC 20001
> (202) 431-8493
> Brendan.Ballou-Kelley@usdoj.gov